OTTO CANDIES, INC.

v.

McDERMOTT INTERNATIONAL, INC.

Civ. A. No. 82–2464.

United States District Court,
E.D. Louisiana.

Jan. 4, 1985.

Cornelius G. Van Dalen, Allen F. Campbell, G. Alex Weller, New Orleans, La., for plaintiff.

John J. Broders, James E. Wright, III, New Orleans, La., for defendant.

## MEMORANDUM OPINION

CASSIBRY, Senior District Judge.

In this admiralty case, Otto Candies, Inc. ("Candies") has sued McDermott International, Inc. ("McDermott") claiming breach of bareboat charter parties on two barges owned by Candies. Candies contends that during the charter period, the barges sustained extensive damage which was not properly repaired by McDermott as required by the charter agreements. McDermott, disclaiming liability, insists that it has fully complied with the charters. Furthermore, McDermott has raised a counterclaim against Candies for unjust enrichment alleging that the barges were actually returned in better condition than when delivered to McDermott at the inception of the charters. Finally, McDermott asserts that Candies' damage estimate for the alleged breach includes repairs necessitated by "ordinary wear and tear" to the barges for which McDermott is not responsible under the charter agreements.

The case was tried, briefed, and submitted. The court now enters the following findings of fact and conclusions of law in support of its judgment.

## FINDINGS OF FACT

### I.

Plaintiff Candies is a Louisiana corporation with its office and principal place of business in Des Allemands, Louisiana. For purposes of this case, it was engaged in the business of owning and chartering its vessels for use in the offshore oil and gas industry.

### 2.

Defendant McDermott is a corporation organized under the laws of Panama, but authorized to do and doing business in the state of Louisiana, and maintaining an office in New Orleans, Louisiana. McDermott is engaged in the business of offshore construction and occasionally charters vessels for that purpose.

### 3.

The barges involved in this case are the OC 252 and the OC 254; Candies owns both barges.[1] The barges are typical ocean-going steel deck cargo barges with watertight

---

1. Although Candies Towing Co., Inc. is actually the registered owner of the barges, plaintiff Otto Candies, Inc. is the disponent owner. The two corporations are closely related entities sharing the same officers, directors, shareholders, and employees.

bow and stern rake compartments and four or five sets of port, center, and starboard watertight main hull compartments. Each one is approximately 250 feet in length, 72 feet in breadth, and 15.5 feet in depth. The OC 252 was built in 1970, and the OC 254 in 1976.

4.

Both barges must be classified and approved by the American Bureau of Shipping ("ABS") for ocean-going service. In addition, both barges are subject to inspection and certification by the U.S. Coast Guard. Each barge is classified as "ABS Maltese Cross A–1."

5.

Candies leased the OC 252 and the OC 254 to McDermott through identical bareboat charter parties dated October 31, 1982. The agreements were drafted by McDermott and submitted to Candies. The parties discussed the contracts in McDermott's office in New Orleans and agreed upon the charter period and the rate of hire for each barge. The initial term of hire was for ten months commencing on September 20, 1980. Subsequently, the parties agreed to extend the charters beyond the initial term with the rate of charter hire increased to $1,512.00 per day per barge.

6.

The charter agreements required each barge to be surveyed prior to delivery and on redelivery by a "mutually acceptable independent marine surveyor." Walter Hazard, representing McDermott, contacted Mike Candies, a Vice President of Candies, in order to select a surveyor. A series of candidates were suggested and rejected in turn by each negotiator until Mr. Hazard proposed the surveying firm of Bachrach and Wood Associates, Inc. Mike Candies agreed to this firm, but only if Norman Laskay, a surveyor with Bachrach and Wood, actually performed both the on-charter and off-charter surveys. Mike Candies insistence upon Laskay prompted Hazard to call Laskay to ascertain his surveying philosophy and techniques. Apparently satisfied with this interview, Hazard agreed to Laskay as surveyor.

7.

Laskay performed the on-charter survey of the OC 254 on September 12, 1980 and that of the OC 252 on September 20, 1980. McDermott had a representative at both on-charter surveys, and Candies had a representative at the survey of the OC 254.

8.

As stipulated by the parties, Laskay's surveys depict the general on-charter condition of the barges. According to these surveys, some damage did exist in each barge at the time of delivery. However, this damage did not render the barges unseaworthy or unfit for use in offshore construction. I find that Candies, in accordance with the warranties contained in the charters, delivered the barges to McDermott in a staunch, tight and strong condition, suitably classed by ABS and certified by the U.S. Coast Guard, and in all respects, seaworthy and fit for their intended use.

9.

McDermott accepted the barges as suitable under the terms of the charter parties and dispatched them to the coastal waters of Brazil for use in pipelaying operations. Both barges were heavily damaged during those operations while under McDermott's control.

10.

On February 19, 1982, McDermott sent a telex to Candies confirming that the barges would be surveyed upon their return to the United States by the "same surveyors" who performed the on-charter surveys. Shortly thereafter, the barges arrived in Louisiana. McDermott contacted Bachrach and Wood and requested that Norm Laskay perform the off-charter surveys. Laskay was unavailable due to another job commitment so McDermott instructed the firm to send someone in his stead. McDermott failed to advise Candies of this development. James Dubuc and Larry Strouse of Bachrach and Wood were selected as replacements for Norm Laskay by either McDermott or the surveying firm, but in

any case, without Candies' knowledge or consent.

### 11.

The off-charter surveys of the OC 252 and the OC 254 were commenced on February 25, 1982 at the Delta Shipyard in Houma, Louisiana. Anthony Brown, an independent marine surveyor, attended the surveys as Candies' representative.[2] Brown had been instructed by Mike Candies to accompany Norm Laskay on the off-charter surveys. Brown testified that at some point during the day, he informed Mike Candies that Laskay was not present at the surveys. Candies protested Laskay's absence in due course.

McDermott was represented at the off-charter surveys by Rick Volkmann. Brown accompanied Strouse on the survey of the OC 252 while Dubuc surveyed the OC 254. Some days later, Brown returned to the Delta Shipyard to survey the OC 254 on Candies' behalf.

### 12.

Dubuc and Strouse submitted their reports to McDermott and copies were provided to Candies. Brown testified that during the survey of the OC 252, he and Strouse had disagreed on the extent of the damage in the number three and four compartments on the port side of the barge. In Brown's opinion, the damage was more extensive in those areas than Strouse had noted in his report. This difference of opinion between Brown and Strouse is slight when compared to the obvious and drastic discrepancies between the surveys done by Brown and Dubuc of the OC 254. Dubuc's survey omits significant and substantial damage to the hull plating, internal members, and connecting frames of the OC 254 noted by Brown. These areas had not been reported as damaged in the on-charter survey.

McDermott, naturally, contends that Dubuc's survey accurately reflects the off-charter condition of the OC 254 and the damage attributed to McDermott's use of it. However, based on Mr. Dubuc's testimony and all the other evidence in this case, I find that Dubuc's findings are grossly inaccurate and fail to portray the damage sustained by the OC 254 while on charter. In addition, Dubuc's survey made insufficient and incomplete repair recommendations for the damage he did report. Dubuc himself testified that he was aware of the fact that most of his repair recommendations would have to be redone by Candies in order to return the barge to service.

### 13.

Candies contacted Bachrach and Wood and requested that the barges be resurveyed. This request was refused with the explanation that any such action would have to receive prior approval from McDermott. Candies contacted McDermott to discuss the problems encountered with the surveys done by Dubuc and Strouse. A meeting between the parties was held during the first few days of March, 1982. At the meeting, Mike Candies suggested that Laskay, or any other mutually agreeable surveyor, resurvey the OC 254. This proposal was rejected by McDermott and the meeting failed to resolve the dispute.

### 14.

A series of telexes passed between Candies and McDermott following the early March meeting. The first in the series dated March 9, 1982, advised McDermott that Candies disagreed with the manner, method, and extent of the repairs noted and proposed in the off-charter survey reports. McDermott's reply, also dated March 9, 1982, stated that the survey reports were binding on the parties under the terms of the charter agreements and that therefore repairs would commence immedi-

---

**2.** Mike Candies testified that the employ of Mr. Brown was necessitated by the fact that no employee of Candies was available to act as representative at the surveys. Although there was testimony to the effect that Brown was to conduct a joint survey of the barges, no evi-

dence was presented which indicated that Brown's participation in the off-charter surveys was a breach of the charter parties. Any contention by the defendant to this effect, therefore, is without merit.

ately. Candies sent a subsequent telex, dated March 10, 1982, advising that the off-charter surveys were not binding since the agreed upon surveyor was Norm Laskay. Candies also requested that repairs not begin until ABS representatives had an opportunity to inspect the barges in conjunction with a review of the surveys performed to date. McDermott offered to return the unrepaired barges to Candies with a lump sum settlement of $652,600.00. This offer, however, was conditioned upon payment by McDermott's underwriters upon completion of the repairs. Candies rejected McDermott's conditional offer as unsatisfactory.

### 15.

On March 10, 1982, Mike Brown, representing the U.S. Coast Guard, and Chris Kremenic, representing ABS, inspected the OC 254 for damage and to make repair recommendations. They subsequently sent a letter to Walter Hazard of McDermott advising him that "[t]he Bachrach & Wood [off-charter] survey of 25 Feb 82 does not appear to include sufficient and satisfactory repairs to meet minimum USCG and ABS requirements." Despite this admonition, McDermott placed the OC 254 with Cenac Shipyards for repairs in accordance with Dubuc's repair recommendations.

Kremenic also inspected the OC 252 to ascertain its condition and to make repair recommendations. Kremenic agreed with Anthony Brown concerning the extent of the damage to the number three and four compartments on the port side of the barge and also found damage to the port bow rake compartment. The record supports Candies' contention that much of this damage was attributable to McDermott's use of the barge. However, McDermott chose to follow the Bachrach and Wood off-charter survey, which failed to reflect this damage, and placed the OC 252 with Delta Shipyards for repairs in accordance with Strouse's survey report and recommendations.

### 16.

In accordance with usual custom and practice, McDermott signed contracts with each shipyard containing provisions that the repairs be made in conformance with ABS and Coast Guard regulations. Cenac Shipyards, however, immediately encountered difficulties with this contractual provision.

John Fryer, general manager of Cenac Shipyards, testified that the recommended repairs for the OC 254 were inadequate to return the vessel to class or to obtain Coast Guard certification. Thus, Cenac could not repair the OC 254 in conformance with ABS and Coast Guard regulations. Upon receipt of the letter from ABS and Coast Guard representatives Brown and Kremenic concerning the inadequacy of Dubuc's off-charter survey, Fryer met with McDermott officials to discuss the troublesome clause in the repair contract. A simple solution was adopted: all provisions in the contract to the effect that repairs had to be in conformance with ABS and Coast Guard standards were deleted. Candies was unaware that McDermott had released Cenac from this obligation.

Fryer also testified that he had realized from the beginning that the majority of Cenac's repairs to the OC 254 would have to be ripped out and redone. This was not because of inadequate or faulty workmanship on Cenac's part, but as a result of omissions, lack of connections, and adjacent damaged areas in the barge which Dubuc had failed to recommend for repair. Fryer said that bilge brackets and frames were installed but not connected properly in the OC 254 in accordance with McDermott's instructions.

Cenac completed repairs to the OC 254 in mid April. Chris Kremenic resurveyed the barge to determine whether the repairs had been made in accordance with his recommendations and in conformance with ABS regulations. A report issued on April 14, 1982 finding that the repairs were insufficient to return the vessel to class and did not conform with minimum ABS and Coast Guard regulations. Thus, the majority of the repairs to the OC 254 were disapproved by ABS and the Coast Guard.

17.

The repairs to the OC 252 proved to be much more satisfactory than those to the OC 254. Unlike Cenac, Delta Shipyards remained obligated to perform the repairs in conformance with ABS and U.S. Coast Guard requirements and regulations. The repairs to the OC 252 were completed on or about May 10, 1982. ABS approved the repairs made by Delta pursuant to Strouse's off-charter survey with the exception of the number three and four port compartments and a small area in the port half of the bow rake compartment.

18.

After the work was completed at Delta and Cenac Shipyards, neither vessel could return to service or to class without further repairs. The damage Kremenic and Brown had noted prior to the commencement of work at the shipyards had not been properly or completely repaired. In addition, much of the repair work on the OC 254 had to be redone or renewed.

Candies engaged Wally Shiver of Crescent Marine Surveying to conduct further surveys of the OC 252 and the OC 254. McDermott was represented at these surveys by Frank Lopez. Shiver's report agreed with all prior surveys conducted on Candies' behalf as well as those performed by ABS and the Coast Guard.[3] Shiver's repair recommendations were based on a comparison between the conditions noted in Laskay's on-charter survey and those present after the repairs to the barges were completed by Cenac and Delta Shipyards. Shiver's recommendations were then used to formulate repair specifications for the barges.

19.

Repair specifications for the OC 252 were prepared for the items in the bow rake and the number three and four port compartments which had been disapproved by ABS and the Coast Guard. Candies submitted the specifications to six ship-yards for bids. Candies selected the lowest bidder, American Marine Shipyards, and work was placed in hand on or about May 27, 1982. Repairs to the OC 252 were completed on June 25, 1982 and approved by ABS and the Coast Guard.

Repair specifications were likewise submitted for bids on the OC 254. Delta Shipyards placed the lowest bid and Candies placed work in hand on or about May 7, 1982. Repairs to the OC 254 were completed on July 15, 1982 and approved by ABS and the Coast Guard. Candies now seeks to recover the costs of these subsequent repairs along with other costs which it claims are related to McDermott's breach of the charter parties on the OC 254 and the OC 252.

## CONCLUSIONS OF LAW

1.

This is an admiralty and maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The court has jurisdiction pursuant to 28 U.S.C. section 1333 and venue is proper in the Eastern District of Louisiana.

2.

The interpretation and construction of a charter party is governed by federal law. *Atlantic Lines, Ltd. v. Narwhal, Ltd.*, 514 F.2d 726, 721 (5th Cir.1975). As a rule, charter parties are to be construed in accordance with general principles of contractual construction. *See, e.g., Horn v. CIA de Navegacion Fruco, S.A.*, 233 F.Supp. 637 (S.D.Ala.1964), *aff'd in part, rev'd in part on other grounds*, 404 F.2d 422 (5th Cir.1968).

3.

McDermott claims that it did not breach the charter agreements because the barges were repaired in accordance with the off-charter surveys which were binding on the parties. Candies denies that the off-charter surveys were binding since they were

---

**3.** These prior surveys were conducted by Anthony Brown and Dan McCloy. Mr. McCloy, a marine surveyor with the firm of Wright Marine Surveying, made findings essentially identical to Brown's. All three of the reports, Brown's, McCloy's and Shiver's, attribute considerably more damage to McDermott's on-charter use of the OC 254 than did Dubuc's off-charter survey.

not performed by the "mutually acceptable marine surveyor." [4] Candies insists the phrase connotes an individual while McDermott argues it refers to a particular surveying firm.

 Although the interpretation of a contract is normally a question of law, that interpretation frequently depends on the resolution of factual disputes. *Cook Industries, Inc. v. Community Grain, Inc.,* 614 F.2d 978, 980 (5th Cir.1980). I have already found that McDermott and Candies agreed upon an individual, Norm Laskay, to do both the on and off-charter surveys. Thus, although the phrase "mutually acceptable surveyor" could be construed to mean a surveying firm as opposed to an individual within that firm, the evidence in this case clearly establishes that the parties intended to have one person perform both surveys.[5] This conclusion is buttressed by the rule that any ambiguity existing in a contract should be construed against its drafter. *Zapata Marine Service, Inc. v. O/Y Finn Lines, Ltd.,* 571 F.2d 208, 209 (5th Cir.1978). McDermott drafted the charters; therefore, any remaining doubts will be resolved against McDermott and in favor of Candies.

In sum, because the off-charter surveys were not performed by the mutually acceptable surveyor as required by the charter parties, they were not binding under the terms of the charters.

**4.**

Alternatively, McDermott argues that, regardless of whether the off-charter surveys were binding, it has fully discharged its obligation to repair the barges. According to McDermott's interpretation, the charters only required it to maintain the barges in the same condition and class as when received. McDermott, in its post-trial brief, argues that at the time of the on-charter survey, neither barge would have passed an ABS special or annual survey.[6] Thus, McDermott reasons, it should not have to pay for repairs to return the vessels to class since they were not in class at the inception of the charters. Candies contends that the barges were in class at the inception of the charters and that McDermott was required by the charter parties to return the barges to class at the end of the charters.

 Neither Candies nor McDermott argues that the charter parties are ambiguous on this point, nor do I find them to be. Absent a latent or patent ambiguity, the meaning of a contract is a matter of law to be decided by the court. *Christopher v. Safeway Stores, Inc.,* 644 F.2d 467, 471 (5th Cir.1981). The charter parties clearly require the charterer to maintain the barges in the same class and condition they were in when delivered. Equally clear, however, is the requirement that the barges be drydocked and *returned* to class if required by damage.[7] Thus, McDermott had a dual obligation as charterer: to main-

---

**4.** Article 4 of the charter parties states, in pertinent part, as follows:

> Said Vessel shall be surveyed prior to delivery and on redelivery by a mutually acceptable independent marine surveyor, to determine its condition, and the cost of such surveys on delivery and redelivery shall be borne equally between the Owner and Charterer. The findings of the surveyor concerning the condition of the Vessel on redelivery shall be binding on the parties hereto....

**5.** McDermott's own representative and witness, Walter Hazard, testified that Mike Candies had insisted upon Norm Laskay as surveyor. In addition, when the barges returned to the United States, Rick Volkman of McDermott specifically requested Norm Laskay to do the off-charter surveys. Evidently, Mr. Volkman thought the fact that Laskay was unavailable of suffi-

cient consequence to report it to Hazard, his immediate supervisor. Unfortunately, Hazard chose not to relay this information to Candies. The obvious problem with this course of conduct was that it deprived Candies of the opportunity to agree upon Laskay's replacement.

**6.** A special survey is conducted every four to five years and is more thorough and exacting than an annual survey.

**7.** Article 1 of the charter parties provides, in pertinent part, as follows:

> Charterer shall maintain the Vessel in the same class as the Vessel was delivered as prescribed by the Rules of the Country of Registry or the rules under which the Vessel is registered. Charterer's obligation in this regard shall be:
> A) If required by damage, Charterer shall drydock the Vessel, to return the Vessel to class.

tain the vessels in class and, if required by damage, to return them to class.

■ As a factual matter, I have already found that the barges were seaworthy and properly classed and certified by the U.S. Coast Guard and ABS for ocean-going service at the inception of the charters. Furthermore, the weight of the evidence favors the conclusion that the barges would have passed an annual or special survey at the time of the on-charter survey with the exception of very limited areas which were extremely aggravated during the charter period. In any event, at the completion of McDermott's repairs to the barges, neither one was approved for ocean-going service and, thus, McDermott did not return the vessels in the same condition and class in which they had been delivered in breach of the charter parties.

McDermott makes much of the fact that the certification and class of the barges had expired during the charter period. However, this alone does not excuse McDermott from its obligations under the contract. Both the OC 252 and the OC 254 were severely and extensively damaged while on charter. This damage alone, regardless of when class expired, was sufficient to take the barges out of class. Under McDermott's own contract, such damage required it to drydock the barges and return them to class. In its failure to do so, McDermott breached the charter parties and caused damage to Candies.

## DAMAGES

### 1. Cost of Repairs Incurred by Candies.

■ The court finds that McDermott failed to repair damage in the number

three and four port compartments and in the port bow rake compartment of the OC 252. This damage was either attributable solely to McDermott's on-charter use of the barge or was seriously aggravated during the charter period. Under the terms of the charter, McDermott is liable for the cost to repair this damage. The cost of repairs to the OC 252 incurred by Candies and reflected in Repair Specification "A" was $79,452.00.[8]

The court finds that the OC 254 sustained significant and costly damage during the charter period which McDermott either ignored or inadequately repaired. In order to comply with ABS and Coast Guard standards, most of the repairs recommended by Dubuc had to be renewed or completely ripped out and redone. The repairs recommended by Dubuc did not return the OC 254 to its on-charter condition, and certainly did not, as testified by Dubuc himself, return the barge to class. The cost to repair the charter-related damage on the OC 254 incurred by Candies and reflected in Repair Specification "A" was $326,018.00.

### 2. Credit for Pre-Existing Damage.

■ Candies conceded at trial that McDermott is entitled to some credit for preexisting damage in the number three and four compartments of the OC 252. Mr. Laskay estimated the cost to repair the damage in these areas to be between $12,000.00 and $16,000.00 at the time of the on-charter survey.[9] This damage, however, was extremely aggravated during the

8. Two sets of repair specifications were prepared for Candies on each barge. Repair Specification "A" listed those repairs necessary to return the barges to their on-charter condition and class and are therefore for McDermott's account. Repair Specification "B" listed those repairs necessary to correct old or pre-existing damage which was strictly for Candies' account. No claim has been asserted for the cost to repair the damage reflected in Repair Specification "B".

9. In its post-trial brief, McDermott contends that it is entitled to a credit between $73,000

and $103,000. These figures represent Laskay's repair estimate for the entire barge at the time of the on-charter survey. However, McDermott is not entitled to a credit for pre-existing damage in the barge as a whole, but only in those isolated areas which it failed to repair. This is because McDermott only repaired the OC 252 to the extent necessary under the terms of the charter parties. McDermott's own surveyor, Larry Strouse, testified that the repairs he recommended, and which in fact were completed by McDermott, were simply to place the barge back in its on-charter condition. Thus, even if there was pre-existing damage in areas other

charter period. Thus, although McDermott is entitled to credit for pre-existing damage, it must bear a portion of the cost to repair the number three and four port compartments. The court finds that an appropriate and equitable resolution of this issue is to divide the costs of repair, as estimated by Laskay, equally between the owner and charterer. Thus, McDermott is entitled to a credit of $7,000.00 (fifty percent of the average sum quoted by Laskay) against Candies' cost to repair the OC 252.[10] This results in a recoverable amount of $72,452.00.

According to Captain Blann, a former Coast Guard marine inspecting officer and plaintiff's expert witness at trial, the OC 254 had isolated damage in the number one and two port compartments which would have had to have been repaired in order for the barge to pass ABS and Coast Guard inspection at the time of the on-charter survey. Blann has had vast experience in ABS and Coast Guard inspection requirements for ocean-going vessels and I find his testimony as to the precharter damage to be the most credible. Furthermore, McDermott failed to adequately rebut this evidence by presenting equally credible and concrete evidence of more extensive precharter damage. It should be noted that other areas of pre-charter damage pointed

out by Captain Blann were repaired by Candies in accordance with Repair Specification "B" which was for owner's account and for which no recovery is being sought.

Laskay testified that the cost to repair the number one and two port compartments would have been approximately $31,202.00 at the time of the on-charter survey.[11] However, it is beyond question that the damage in these areas was extremely aggravated during McDermott's on-charter use of the OC 254. Therefore, as with the OC 252, a sharing of costs between owner and charterer is in order. As previously stated, the court finds that McDermott is entitled to a credit of fifty percent of Laskay's estimated cost to repair the pre-existing damage in the OC 254 or $15,601.00. This results in a recoverable amount of $310,417.00.

### 3. Credit for Wear and Tear.

■ McDermott contends that Candies' claim for damages includes the cost of repairs necessitated by ordinary wear and tear. The charter parties expressly exonerate the charterer from responsibility for costs associated with "ordinary wear and tear."[12] Thus, McDermott asks the court to deduct from any award to Candies, an amount to account for wear and tear and

than the number three and four port compartments, McDermott did not repair it.

**10.** I used the following formula to arrive at Candies' recoverable costs to repair the OC 252:
Recoverable Costs = Cost to Repair—Credit for Pre-existing Damage
= $79,452.00 − (.50 × $14,000)
= $72,452.00
This formula was also used in computing the recoverable costs to repair the OC 254.

**11.** In its post-trial memorandum, McDermott again quotes Laskay's repair estimates for the entire barge. However, the weight of the evidence convinced me that McDermott did not repair any pre-existing damage noted by Laskay in the on-charter survey. Therefore, McDermott is not entitled to credit for such damage.

**12.** The charter parties make reference to the subject of wear and tear in the following articles:

3.
Upon termination of this Agreement, unless the Vessel shall be lost or destroyed, Charterer shall return the Vessel to Owner at Harvey, Louisiana, in the same good order and condition as when received, ordinary wear and tear excepted.
4.
.... Charterer warrants and agrees to forthwith on redelivery, at its own expense, do all things necessary to restore the Vessel to its condition at the time of her delivery, ordinary wear and tear excepted.
.... In the event damage greater than wear and tear is noted by the surveyor then it shall be the Charterer's duty to: a) repair the Vessel or cause the Vessel to be repaired at its own cost....
10.
Charterer shall be fully responsible for maintenance and repair of the Vessel and shall at all times maintain and preserve the Vessel in the same good order and condition as when delivered to Charterer, ordinary wear and tear excepted.

suggests that this amount should be, at a minimum, twenty-five percent of the charter hire. Having reviewed all the evidence and the applicable law, the court concludes that McDermott is not entitled to any credit for wear and tear.

 The charter parties fail to define the meaning of the phrase "ordinary wear and tear." The applicable rules of construction are well established in such a case. The words in a contract will be given their ordinary meaning unless the circumstances show that a different meaning was intended by the parties. *Navios Corp. v. The Ulysses II*, 161 F.Supp. 932, 939–40 (D.Md.1958), *aff'd* 260 F.2d 959 (4th Cir. 1958).

The usual and ordinary meaning ascribed to the phrase "wear and tear" is that deterioration of condition or depreciation in value attributable to normal and reasonable use of an object. Black's Law Dictionary 1764 (4th ed. 1951). What is normal and reasonable use depends upon the service for which the object is intended. *Moran Towing Corp. v. M.A. Gammino Construction Co.*, 363 F.2d 108, 114 (1st Cir. 1966). Other factors useful in defining normal wear and tear include the age of the object and any applicable guidelines or practices in the particular industry. *See, e.g., Interpool, Ltd. v. Central Gulf Lines, Inc.*, No. 81–6454, slip op. (S.D.N.Y. July 30, 1983).

The testimony in this case was unanimous in setting a standard for ordinary wear and tear as indents up to three inches in depth which do not impair the structural integrity of the barge. This standard is applicable to barges used in the offshore construction industry and of like age as the OC 252 and the OC 254. Furthermore, neither ABS nor the Coast Guard require conditions attributable to ordinary wear and tear to be repaired in order for a barge to be classified and certified for ocean-go-

ing service. Structural damage, on the other hand, is not considered wear and tear and must be repaired in order for a vessel to be certified for ocean-going service.

All of the marine surveyors who inspected the OC 254 and the OC 252 upon their return to the United States found them to have sustained structural damage. The OC 252 went on charter with various indents in the shell plating of up to three inches in depth which did not impair the structural integrity of the barge.[13] At the time of the off-charter survey, the OC 252 had sideshell and internal damage with indentations of up to five feet. The OC 254 was also heavily damaged with indentations extending up to as much as eighteen to twenty-four inches in depth. ABS and the Coast Guard characterized both barges as being heavily damaged and required extensive repairs throughout each one in order to return them to class and service as ocean-going vessels.[14] No evidence was presented which showed that any portion of the required repairs was necessitated by ordinary wear and tear.

McDermott responds to the uncontroverted evidence on this issue with the argument that Candies anticipated that the barges would sustain "a great deal of wear and tear, i.e., damage" during the charter period. Thus, McDermott equates wear and tear with damage and states that the cost to repair this damage was included in Candies' rate of charter hire. In effect, McDermott argues that Candies assumed the risk of the damage sustained and therefore cannot recover for the costs incurred to repair it.

There is nothing in either the record or the law to support McDermott's argument. No special circumstances were presented to show that the charter parties actually meant to hold the owner liable for damage as opposed to ordinary wear and tear. Furthermore, even if Candies did expect

---

**13.** The only exception to the depth of the indentations as stated was in the number three and four port compartments of the OC 252 for which pre-existing damage McDermott has received credit as previously explained.

**14.** ABS representative Chris Kremehic testified that heavy damage is generally defined as indentations in excess of six inches.

the barges to come back damaged, the expectation under McDermott's own charter agreements was that McDermott would bear the cost of repairing this damage. There was no evidence which established that the rate of charter hire in any way reflected the amount of damage suffered by the barges while on charter. Instead, the record clearly establishes that Candies has met its burden of proving McDermott's liability for the subsequent repairs to the barges which were necessary to restore them to their on-charter class and condition. McDermott failed to rebut plaintiff's proof of these costs by showing that any amount of wear and tear was included in the repair bills. McDermott's suggestion that the court deduct twenty-five percent of the charter hire to account for wear and tear finds no support in the charter parties or any other evidence presented in this case. In sum, no repairs effectuated by Candies or McDermott was necessitated by ordinary wear and tear. Thus, McDermott is not entitled to any credit for wear and tear.

### 4. Unpaid Charter Hire.

Under the terms of the charter parties, the charterer was required to continue to pay charter hire until the barges were repaired and returned to service.[15] McDermott stopped paying charter hire on April 1, 1982. However, the barges were not approved by ABS and the Coast Guard for service until after subsequent repairs were effectuated by Candies. Therefore, McDermott is liable for unpaid charter hire from April 1, 1982 until the OC 252 and the OC 254 were properly repaired and approved for service on June 25, 1982 and July 15, 1982, respectively. At the charter rate of $1512.00 per day per barge, McDermott owes $130,032.00 for unpaid charter hire on the OC 252 and $160,272.00 for unpaid charter hire on the OC 254.

### 5. Miscellaneous Fees and Expenses.

Candies seeks to recover various additional expenses incurred as a result of McDermott's breach of the charter parties. The majority of these expenses consist of the travel costs and survey fees paid to Anthony Brown, Wallace Shiver, Dan McCloy, and the ABS. Additionally, Candies seeks the costs of outside tugs used to tow the barges to American and Delta Shipyards for repairs. In support of these claims, Candies introduced a miscellaneous accounts file.

McDermott failed to raise an objection to the authenticity or accuracy of plaintiff's miscellaneous accounts file introduced at trial. McDermott's sole challenge to these expenses is based on the contention that the fees paid to Brown, Shiver, and McCloy constitute expert witness fees and are, therefore, unrecoverable. McDermott asks that the court disallow all of the survey fees.

■ Based on the testimony and a review of the invoices submitted, I find that these survey fees were incurred by Candies in order to accurately assess the on-charter damage to the barges and to monitor subsequent repairs necessitated by McDermott's breach of its obligations under the charter parties. Surveyors' fees incurred for trial preparation are not included in plaintiff's miscellaneous expense file. Plaintiff may recover the additional expenses claimed as reflected in this file.

## McDERMOTT'S COUNTERCLAIM FOR UNJUST ENRICHMENT

■ McDermott has raised a counterclaim for unjust enrichment alleging that the barges were actually returned in better condition than when delivered. Specifical-

---

**15.** McDermott's contention that it is entitled to a reduction in charter hire for pre-existing damage misconceives its obligation to pay hire imposed by the charter parties. Although McDermott has received credit for pre-existing damage in both barges, it is not entitled to a proportionate reduction in charter hire. The pre-existing damage found in both barges was severely aggravated during the charter period. It was this aggravation of damage which took the barges out of class. Therefore, under the terms of the charter parties, McDermott was required to pay full charter hire until the barges were returned to class.

ly, McDermott calculates that after reductions are made for pre-existing damage and wear and tear, nothing is owed Candies for the OC 254 and Candies owes McDermott $76,680.00 for the OC 252. Given the above findings, McDermott's counterclaim must fail. Furthermore, McDermott introduced no specific evidence at trial in support of its claim of unjust enrichment. Any repairs effectuated by McDermott during the charter period were its responsibility under the charters. Repairs effectuated pursuant to Strouse's off-charter survey of the OC 252 were simply to return the barge to its on-charter condition. Thus, McDermott did no more, and in some instances much less, than it was required to do under the terms of the charter parties. Therefore, McDermott's counterclaim is dismissed.

### SUMMARY

Based on the above findings of fact and conclusions of law, Candies may recover the following as damages from McDermott for breach of the bareboat charter parties on the OC 252 and the OC 254:

1. The OC 252:

Cost of Repairs
(Adjusted for pre-existing damage) .......... $ 72,452.00

Unpaid Charter Hire
(4/1/82 to 6/25/82 at $1512/day) ............. 130,032.00

Miscellaneous Expenses for Surveyors'
Fees and Outside Tugs ..................... 26,761.54

2. The OC 254:

Cost of Repairs
(Adjusted for pre-existing damage) .......... 310,417.00

Unpaid Charter Hire
(4/1/82 to 7/15/82 at $1512/day) ............. 160,272.00

Miscellaneous Expenses for Surveyors'
Fees and Outside Tugs ..................... 32,464.78
 TOTAL DAMAGE AWARD $732,399.32

 Prejudgment interest shall accompany Candies' award for damages. As a general rule, prejudgment interest should be awarded in admiralty cases unless there are "peculiar circumstances" that would make it inequitable for the losing party to be required to pay prejudgment interest. *Noritake Co., Inc. v. M/V Hellenic Champion,* 627 F.2d 724, 728 (5th Cir.1980). No peculiar circumstances are shown in the record which would warrant a denial of prejudgment interest. Therefore, simple interest shall be assessed at the rate of 1.5% per month. This rate was agreed to by the parties and set forth in the charter agreements. Interest shall accrue from August 15, 1982, or thirty days after both barges were returned to class and service. This date appears both appropriate and equitable. McDermott was clearly on notice that Candies would hold it liable for all costs necessary to fully repair the barges and for charter hire. There is nothing inequitable in requiring McDermott to pay interest on the award of damages for its breach of the charter parties.

Candies is entitled to reasonable attorneys' fees under the terms of the charter parties. This matter is hereby referred to the Magistrate for a determination of the amount of such fees. The Clerk of Court shall withhold entry of final judgment until the amount of attorneys' fees is ascertained.