**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: October 21, 2016
Date Decided: November 14, 2016

Michael Busenkell, Esquire
Gellert Scali Busenkell & Brown, LLC
1201 North Orange Street, Suite 300
Wilmington, DE 19801

John L. Reed, Esquire
DLA Piper LLP
1201 North Market Street, Suite 2100
Wilmington, DE 19801

Gary J. Silversmith
1050 17th Street, N.W., Suite 600
Washington, D.C. 20036

Scott Czerwonka, Esquire
Wilks, Lukoff & Bracegirdle, LLC
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805

Re:  *Sequoia Presidential Yacht Group LLC et al. vs FE Partners LLC*,
Civil Action No. 8270-VCG

Dear Counsel and Mr. Silversmith:

In Joseph Heller's satirical take on the Biblical King David, David laments the stupidity of his son, King Solomon. David invokes Solomon's famous decision resolving a case where two alleged mothers each claim the same baby—Solomon offered to cut the infant in two—which is considered the epitome of wisdom. David tells us the real story: Solomon was "dead serious."[1] It is with chagrin that I recognize that this lengthy litigation has been nearly as deleterious for its "baby";

---

[1] Joseph Heller, *God Knows* 12 (Simon & Schuster, 2004).

the famous ex-Presidential Yacht Sequoia. The Sequoia, an elderly and vulnerable wooden yacht, is sitting on an inadequate cradle on an undersized marine railway in a moribund boatyard on the western shore of the Chesapeake, deteriorating and, lately, home to raccoons.

This suit involves a loan agreement between the lender, FE Partners LLC ("FE Partners") and the borrowers, Gary Silversmith and the Sequoia Presidential Yacht Group, LLC. The loan agreement gives FE Partners an option to purchase the collateral for the loan—the Sequoia. A valuation of the Sequoia for purposes of securing the loan was established via fraud on the part of Gary Silversmith. Claims and counterclaims arising out of the loan agreement were litigated and eventually resolved by a settlement entered as a Court Order on August 29, 2013. All that remained for this Court was to oversee the computation of the amount due Silversmith from FE Partners under the settlement and loan documents, should FE Partners elect to acquire the Sequoia. Unexpectedly, and unfortunately, the resulting issues and litigation expenses involved in that inquiry have dwarfed the original litigation. This Letter Opinion expresses my post-hearing decision concerning the option price for the Sequoia. This inquiry was made simpler by the concession of FE Partners, expressed to this Court by letter of August 28, 2015,[2] that should it

_____

[2] Def's Letter to the Court dated August 28, 2015. The letter estimated that the option price as of that time was negative $1.6 million and stated "[a]lthough the provisions of the Default Judgment Order permit FE Partners to pursue Mr. Silversmith for any deficiencies if the Default Purchase

2

exercise the option (and absent additional fraud or defensive issues absent here) it would not pursue contractual rights to recover sums due it under the settlement agreement to the extent they cause the option exercise price to be less than zero.[3] In other words, FE Partners agreed to a minimum option price of zero dollars. For the reasons below, I find the option price to be zero.

FE Partners has indicated, by letter of October 24, 2016, that it has committed to exercise its option rights once this Letter Opinion is released. With title issues resolved, it is possible that an investment is now reasonable to save the Sequoia from desuetude and otherwise-inevitable destruction.

## I. BACKGROUND

This matter is before me to determine the option exercise price (the "Exercise Price") for the Sequoia based upon the parties' contractual agreements and this Court's prior decisions. The facts of this case, and the conduct of the parties, have been set out in detail in earlier decisions,[4] and will not be repeated here. It is

---

Price is less than zero, *your Honor should be pleased to know that FE Partners only wishes to be done with Mr. Silversmith as quickly as possible and has no present intention of pursuing any such deficiencies*, though it reserves the right to do so if it uncovers further fraud or needs to do so in a defensive proceeding." *Id.* at n.12 (emphasis added).

[3] *Id.* In post-hearing briefing, FE Partners asks me to set a judgment amount to the extent the amounts owed it under the settlement exceed the option price. *See* Def's Post-Hearing Opening Br. 58. To the extent they are attempting to withdraw the statement in the August 28, 2015 letter, they should so indicate, including the grounds for doing so, and I will allow Silversmith and the LLC to respond.

[4] *See e.g.*, *Sequoia Presidential Yacht Grp. LLC v. FE Partners LLC*, 2015 WL 4575795 (Del. Ch. July 30, 2015); *Sequoia Presidential Yacht Grp. LLC v. FE Partners LLC,* 2013 WL 3724946 (Del. Ch. July 15, 2013).

sufficient to state that the Plaintiff, Gary Silversmith, induced the Defendant, FE Partners,[5] to extend a loan to Silversmith's company, the Sequoia Presidential Yacht Group, LLC (the "LLC"; in context, I refer to Gary Silversmith and the LLC, together, as "Silversmith") with the Sequoia as collateral. Representations by Silversmith in connection with the loan were fraudulent. Silversmith initiated this action to enjoin FE Partners from pursuing its rights in connection with the loan, however once Silversmith's fraud came to light, the parties entered into a settlement memorialized in a stipulated default judgment order on August 29, 2013 (the "Judgment Order").

The operative loan documents here include the Amended and Restated Term Loan Agreement (the "Loan Agreement"), the First Priority Preferred Ship Mortgage (the "Mortgage Agreement"), and the Amended and Restated Option Agreement (the "Option Agreement") (collectively the "Loan Documents"). Under the Loan Documents, FE Partners had an option to purchase either a 100% interest in the LLC or to buy the Sequoia itself,[6] for $7.8 million in the event of default.

---

[5] While technically the Defendant, FE Partners is also the counterclaim Plaintiff. In this action FE Partners is pursuing its rights under the loan documents. To avoid confusion, I will refer to the parties principally by name rather than litigation stance.

[6] The yacht is the only asset held by the LLC, which itself is owned by Silversmith.

What followed was a morass of litigation,[7] which is mercifully coming to an end.[8] This opinion addresses the remaining issue—what price FE Partners must pay to exercise its default option. In reaching the Exercise Price I am guided by the parties' contractual agreements, including the Loan Documents,[9] and the law of this case as set out in prior opinions and orders,[10] as well as FE Partners' aforementioned commitment to accept a floor option price of zero dollars. What follows is a discussion of the facts, contracts of the parties, and decisions of this Court necessary to calculate the Exercise Price, and bring an end to this litigation.

*A. The Formula*

The August 29, 2013 Judgment Order provides the basic formula to determine the Exercise Price.[11] The Judgment Order states that I must subtract from the initial Exercise Price, defined in that order as $7.8 million,[12] the following items: FE Partners attorneys' fees and expenses then-incurred in the Delaware action as

---

[7] I note a motion to strike portions of Silversmith's answering brief, which brief raised issues for the first time, including, for example, lender liability, was filed on October 11, 2016. I have not considered issues raised for the first time in Silversmith's answering brief, therefore I have also not considered the sur-reply filed as an exhibit to the October 11, 2016 motion.

[8] Ever the optimist, I.

[9] *See Sequoia*, 2015 WL 4575795, at *9 (stating that the decision generally reserves FE Partners' remaining contractual rights).

[10] As our Supreme Court has described, "[t]he law of the case doctrine is a self-imposed restriction that prohibits courts from revisiting issues previously decided, with the intent to promote efficiency, finality, stability and respect for the judicial system." *State v. Wright*, 131 A.3d 310, 320–21 (Del. 2016) (citations and internal quotations omitted).

[11] JX 27 ¶ 6.

[12] *Id.* at ¶ 2(c)(i).

determined by the process laid out in the Judgment Order;[13] the total amount of FE Partners' loan;[14] and, as determined by independent counsel, Michael Maimone, the amount of:

> the outstanding and pending or potential tax or other applicable liabilities of [the LLC] that must be satisfied to deliver all legal and beneficial right, title and interest in and to either the membership interests in [the LLC or its] interest in the Sequoia Presidential Yacht, in each case free and clear of all liens, encumbrances, claims, rights of first refusal, options, warrants, calls, security interests, charges, pledges or restrictions on transfer of any nature whatsoever. With respect to any exercise of the option for the interests in [the LLC], the final Default Option Price will be further reduced by the amount necessary to satisfy all outstanding debts against the LLC . . . . [15]

The Judgment Order provided that the cost of Maimone's service as independent counsel was to be paid by Silversmith. I begin with the Judgment Order in calculating the Exercise Price.

### B. The Initial Exercise Price

The parties entered into the Option Agreement on July 3, 2012.[16] The subsequent August 29, 2013 Judgment Order affirmed FE Partners' right to purchase the Sequoia, or the membership interests in the LLC, for an Exercise Price of $7.8 million, as adjusted.[17]

---

[13] *Id.* at ¶ 6; *see Sequoia*, 2015 WL 4575795, at *3 (noting that the fee calculation provided for the Judgment Order was for "attorneys' fees and expenses then-incurred").
[14] JX 27 ¶ 6; *see* JX 13 § 8.2.
[15] JX 27 ¶ 6; *see also Sequoia*, 2015 WL 4575795, at *3.
[16] JX 11.
[17] JX 27 ¶¶ 2(c)(i), 6.

Before turning to those adjustments called for in the Judgment Order, I briefly address Silversmith's assertion, in his opening brief, that the Exercise Price should be adjusted *upward.* Silversmith asks that I add to the initial $7.8 million Exercise Price FE Partners' equitable share of three items: the independent counsel's fees, an existing rail line lien against the Sequoia,[18] and that portion of the costs necessary to put the Sequoia back into good working order and repair that Silversmith alleges are attributable to FE Partners.[19] I decline to consider these three items as above the line additions. The Judgment Order from which I am calculating the Exercise Price makes no provision for such adjustments.[20] With respect to the independent counsel's fee, I have already rejected Silversmith's request to shift the fee, and nothing warranting a deviation from that has occurred in the interim.[21] I find no equitable reason to depart from the Judgment Order and attribute to FE Partners the storage costs for the Sequoia, including the rail line lien. Finally, with respect to FE Partners' responsibility for repair costs, I address that with respect to a calculation of Silversmith's contractual responsibility for the cost of putting the yacht in good repair. Thus the starting point for this analysis is the $7.8 million Exercise Price.

---

[18] The Sequoia is hauled out on a marine railway in Deltaville, Virginia, and the boatyard has a lien on her for accrued hauling and storage.
[19] *See* Pls' Post-Hearing Opening Br. 2, Ex. A.
[20] *See* JX 27 ¶ 2(c)(i).
[21] *See Sequoia*, 2015 WL 4575795, at *9.

## II. DISCUSSION

From the initial Exercise Price of $7.8 million, FE Partners is seeking thirty-eight line-item deductions.[22] There is over a $10 million variance between the parties' positions on these proposed deductions.[23] Some of the deductions sought are no longer in dispute. Others are only disputed to a limited extent. These categories are briefly addressed below to demonstrate that the maximum Exercise Price, after accounting for undisputed deductions, is currently $2,414,603.

Silversmith accepts a deduction of $2,490,099 for the initial loan disbursement.[24] He also accepts deductions, so long as they are verified, of $82,877 for payments to crew members, $372,951 for insurance payments, and $33,352 for payments for shipyard and equipment expenses.[25] I find these deductions are adequately supported by affidavits and corresponding billing records.[26] Additionally, Silversmith accepts deductions of $274,011 for a lien owed to his former counsel, Mike Weidinger, and $1,335,573 for attorneys' fees calculated pursuant to the Judgment Order.[27] Finally, Silversmith accepts a deduction of

---

[22] Def's Post-Hearing Answering Br. Ex. A.
[23] *See id.*
[24] Pls' Post-Hearing Answering Br. ("Pls' Ans. Br.") 5.
[25] *Id.*
[26] *See* JX 63 ¶ 5, Ex. D (providing documentation for crew payments); *id.* at ¶ 4, Ex. C (providing documentation for insurance payments); *id.* at ¶ 6, Ex. E (providing documentation for shipyard and equipment payments); *see also* Supp. Aff. of L. Michael Cantor Sept. 26, 2016 (providing documentation for additional insurance payments).
[27] Pls' Ans. Br. 5.

$171,654 for liabilities uncovered by the independent counsel.[28]  The sum of these undisputed deductions is $4,760,397.

The amount of interest accrued under the loan remains in dispute.  However, even with the modifications that Silversmith seeks to the default interest rate, the deduction for this item is, at a minimum, $625,000.[29]  This amount, combined with the other deductions discussed above, places the undisputed portion of the required deductions at $5,385,397.[30]  Thus the Exercise Price is, at most, $2,414,603, *less* disputed but substantiated deductions.  In other words, the Exercise Price must be further reduced by the deductions advocated by FE Partners—opposed, in whole or part, by Silversmith—to the extent I find them required by the Judgment Order and the underlying contracts preserved in that Order.  I start with the deduction for the amount required to bring the Sequoia into the state of repair that Silversmith was obliged by contract to maintain.  Because the cost of the required structural repairs already exceeds $2,414,603, the Exercise Price is zero dollars, and I need not analyze FE Partners remaining proposed deductions.

---

[28] *Id.*  I note Silversmith submits that this figure is subject to "adjustment" for any updates to the outstanding liabilities. Pls' Post-Hearing Opening Br. Ex. A.

[29] Pls' Post-Hearing Opening Br. 8.

[30] This calculation only includes the items discussed above, and does not include an unspecified amount of the rail line lien which Silversmith accepts responsibility for nor his responsibility for the cost of repairs, discussed *infra*.

*A. Contractually Required Repairs*

The Loan Documents required Silversmith to maintain the Sequoia in good working order and repair. It is undisputed that the Sequoia is not presently in the condition required by the parties' contracts. I instructed the parties to file expert reports "regarding the cost to bring the Yacht back to 'good working order and repair,' as defined and required in the First Priority Preferred Ship Mortgage and Option Agreement . . . taking into account all relevant facts and circumstances." (the "Contractual Condition").[31] The results are presented in full below. However, the following brief synopsis may be sufficient for the casual reader.

I presented all parties with the opportunity to have a ship survey performed and for an expert to inform me as to the cost to restore the Sequoia to the condition at which Silversmith was contractually obligated to maintain her. FE Partners had a survey conducted,[32] and provided a thorough expert report. Its chief expert, Earl McMillen, testified, credibly, that the hull of the Sequoia needed a complete rebuild before she could be returned to service, and that the repairs and rebuilding needed to put the hull into contractually-compliant shape will cost $2,750,100.[33] Silversmith's expert, Donald McCann, by contrast offered an opinion only as to the

---

[31] Order dated Feb. 29, 2016.

[32] According to Earl McMillen, his report was partially based on the survey done by Kevin Clarke of Rhode Island Marine Survey. JX 51 at 6–7.

[33] McMillen testified that other ship systems will require repair to be contractually-compliant, at additional cost.

cost required to remedy a list created by the Coast Guard, based on a preliminary inspection, that McCann himself conceded was incomplete and inadequate to restore the Sequoia to the contractually-required standard. McCann candidly admitted that he could not provide an estimate to return the yacht to the Contractual Condition,[34] and that, if a hull rebuild was required, McMillen's estimate of costs was reasonable.[35] I find the amount testified to by McMillen credible, and adopt it. Next, I find that while the contract excepts "wear and tear," I accept McMillen's testimony that none of the $2,750,100 required hull work was for repair of wear and tear items as the parties used that term in the contract, and I find further that Silversmith has failed to submit any evidence or opinion indicating that "wear and tear" could refer to a necessary total hull rebuild. Finally, I consider, and reject, Silversmith's argument that in equity FE Partners should be assessed some of the costs in returning the Sequoia to the contractually-agreed condition, given what Silversmith describes as dilatory tactics on FE Partners' part resulting in otherwise-avoidable deterioration of the Sequoia. McCann, Silversmith's own expert, testified that the delay that has caused the yacht to sit on the railway for an extended period has had minimal impact on the current need for repairs.[36] Therefore, I find that Silversmith's obligation to keep the Sequoia, as collateral for FE Partners' loan, in good working order and

---

[34] May 11, 2016 Default Option Hearing Tr. 268:23–71:9 (McCann).
[35] *Id.* at 301:12–22 (McCann).
[36] *Id*. at 252:14–53:13 (McCann).

11

repair, requires expenditure of $2,750,100 on the hull alone; this amount must be subtracted from the Exercise Price. The details in support of my reasoning follow.

### 1. Analysis of Required Repairs

#### a. The Contractual Terms

The Mortgage Agreement provides, in relevant part, that the borrower

> will at all times and at its own cost and expense maintain and preserve the Vessel in good condition, working order and repair, ordinary wear and tear excepted, and will cause the Vessel to be kept fully equipped and such equipment to be kept in good condition, working order and repair, ordinary wear and tear excepted.[37]

The Option Agreement defines its good working order and repair standard by reference to the above condition set by the Mortgage.[38]

I find the contractual terms are not ambiguous, but rather, that the intent of the parties is clearly understood from the documents read as a whole.[39] The Contractual Condition provisions of "good condition, working order and repair" when read in their context, indicate that the vessel is to be kept in a condition which makes it fit for service in its intended use. This reading is supported by both parties'

---

[37] JX 12 § 2.9.

[38] *See* JX 11 § 7.2 ("Sequoia shall maintain the Vessel in good working order and repair in accordance with the provisions of the Ship Mortgage."). I note that the Option Agreement is governed by New York law. *See id.* at § 9(a) (stating the agreement "shall be construed and enforced in accordance with the law of the State of New York . . ."). Silversmith also asserts that the "Sequoia loan documents apply New York law." Pls' Ans. Br. 12.

[39] *See Maser Consulting, P.A. v. Viola Park Realty, LLC*, 936 N.Y.S.2d 693, 694 (App. Div. 2012) (stating that under New York law it is fundamental that contracts are to be "construed in accord with the parties' intent.").

experts, whose testimony indicates that such standard is a term of art in the maritime industry, informed by the vessel's use, and means the ship is at least a "safe working platform" within the scope of its intended use.[40] Regarding the "fully equipped" contractual mandate, that requires the vessel to be equipped for the services the ship is to perform.[41] Here the intended use would be as a Potomac River charter cruise ship. I find under the contracts that Silversmith was obligated to maintain the vessel such that it was safe, structurally sound, and fully equipped for its intended use as a Potomac River cruise vessel.

### b. The Required Repairs

Unfortunately, as explained below, I am left with only one side's expert reports and testimony that bear on the question of the cost of Silversmith's obligation to maintain the Sequoia. For reasons not in the record, Silversmith did not direct his expert to do an inspection that would allow him to answer the pertinent question, which is what would it take to put this vessel in the Contractual Condition.[42] McCann testified that he was instructed by Silversmith to only examine items on a

---

[40] *See* JX 55 at 45:4–14 (McCann). Silversmith's expert also indicated that in layman's terms this would mean the vessel would need to be in "safe working order" for its intended use, which here would be river passages in and around Washington, DC. *See id* at 45:15–46:12 (McCann).

[41] *See* May 11, 2016 Default Option Hearing Tr. 296:15–17 (McCann). Silversmith's expert explained that this was the correct standard for "fully equipped" and that he would expect the vessel to have the appropriate items for its intended use, including for example, a depth sounder. *Id.* at 296:15–22 (McCann).

[42] *Id.* at 305:11–16. Following the hearing, I considered engaging a Court expert to do an independent survey of the Sequoia, but I determined that 1) the testimony of FE Partners expert witnesses was sufficient to a decision here, and 2) engaging a Court expert, under these circumstances, would only increase litigation effort, which already exceeded optimality.

preliminary Coast Guard work list dating to 2014 (the "Work List"), determine whether the Work List was "fair and reasonable," and then classify which repairs should be treated as a "capital expense," which according to Silversmith must be excluded from the cost of repairs, as contrasted with maintenance expenses, which Silversmith indicated should be included.[43] McCann testified he was not asked by his client to perform a full condition survey of the Sequoia which would allow him to have prepared an opinion on the Contractual Condition.[44] In other words, Silversmith failed to provide an expert who could offer testimony on the question pertinent, the cost to restore the Sequoia to the Contractual Condition.[45]

Instead, Silversmith attempts to rely on a $309,650 quote to complete the Work List, from Chesapeake Boat Works ("CBW"), the yard in which the Sequoia is currently lying. Again, that estimate is insufficient to the purpose pertinent here. I note that the Work List itself states that the repairs it mandates "should not be construed as an inclusive list since there may be other deficiencies which have not been identified."[46] Silversmith's expert, McCann, testified there would be additional costs beyond the Work List "because the Coast Guard investigation is not

---

[43] *Id.* at 239:4–14 (McCann). I note that Silversmith dropped the "capital expenses" line of argument at the hearing. *Id.* at 291:8–22.

[44] *Id.* at 268:23–71:9 (McCann).

[45] I mean to convey no disrespect for Silversmith's expert, Donald McCann, who I found to be competent and credible. He was unfortunately not instructed by his clients to opine on the relevant question here—what repairs are required, and what would they cost, to return the Sequoia to the Contractual Condition.

[46] JX 34.

14

complete,"[47] and that he "would fully expect" additional Coast Guard required work.[48]

McCann testified that without a full condition survey, he could not, and did not attempt to, render an opinion on what work was necessary to put the Sequoia in the Contractual Condition, nor did he prepare an opinion on what was required to make Sequoia fully equipped as defined in the contracts.[49] McCann also did not prepare the cost of repairs for the Work List items independently, because the cost of repairs are not "within the parameters of what [he] does."[50] Rather he relied on CBW's estimates and opined that those were "fair and reasonable given the list that was given" to him.[51] Consistent with the opinion of FE Partners' expert, discussed below, McCann stated that "there's a great deal of decayed wood that needs to be rectified."[52] Such rectification, I note, is not fully addressed in the Work List. Having found the evidence presented by Silversmith inadequate to supply the cost to return the Sequoia to the Contractual Condition, I turn to the evidence provided by FE Partners.

I have before me McMillen's unrebutted opinion that the hull needs to be rebuilt in order to put the Sequoia into the Contractual Condition. McMillen reached

---

[47] May 11, 2016 Default Option Hearing Tr. 246:9–17 (McCann).
[48] *Id.* at 275:10–76:4 (McCann) (explaining that "there will be more lists—more on the list").
[49] *Id.* at 268:23–71:9, 271:24–72:3 (McCann).
[50] *Id.* at 240:8–16 (McCann).
[51] *Id.* at 240:19–23 (McCann).
[52] *Id.* at Tr. 242:1–2 (McCann).

15

this conclusion based on several factors including the condition of the frames inside the hull, the hull's exterior planking, the vessel's loss of proper hull shape,[53] and damage incurred during the December 2014 haul out.[54]  When I asked McMillen directly during his testimony if there was not a cheaper way to put the vessel into the Contractual Condition, he explained that given the state of disrepair and rot the vessel had reached, patchwork repairs, such as sistering frames,[55] are no longer an option.  I find most instructive the following exchange:

> THE COURT: Sir, if someone approached you to try to do this job in the most cost effective way by simply sistering the frames, using penetrating epoxy, doing a refastening job and trying to get [the Sequoia] in the water so that it could be used in the cheapest possible way safely, could that be done more cheaply than what you've done here, or is that not something you could do?
>
> THE WITNESS: I certainly wouldn't assume any liability. The number that came back from CBW of several hundred thousand dollars, I can't imagine that they would stake their reputation and assume the liability that by merely making that amount of repair to the boat in her current condition. It would be a band-aid on a -- putting your thumb in the dike sort of thing. It's just -- there's so much there that -- *the degradation of the structure is so widespread on the boat. You don't have any good frames to even sister to.*
>
> THE COURT: That's true even if her use was to be restricted to the river and use up and down the Potomac.

---

[53] Currently, the hull is "hogged."

[54] *See* JX 51 at 5–6.

[55] When explaining a photo, located in JX 51 at 60, McMillen provided the following description of "sister": "[a]gain, broken sister frames. A sister framing is a technique of making a repair which is a low-cost way of just driving another frame in alongside the other frame . . . . It's just an added frame that generally gives support in the turn of the bilge. And here you have broken frame next to broken sister frame." May 11, 2016 Default Option Hearing Tr. 46:7–15 (McMillen).

THE WITNESS: *Correct. The fact that she's -- the frames have already been sistered, and those frames have now cracked or degraded. So the cheap repairs have been made at this point, and going that route has already been done once. In my opinion, it can't be done again.*[56]

McMillen's testimony was unrebutted, and, I find, credible. It is supported by photographic evidence depicting the hull's poor condition.[57] I find that the hull rebuild proposed by McMillen is required to put the Sequoia into the Contractual Condition. Although this is a major repair, it is not only required under the contract, but also supported by equity. This loan, and the accompanying option were made under false pretenses of the Sequoia's condition and value.[58] If the vessel had been in the condition represented, there would likely be no need for structural repairs now.

### c. The Cost; Exception for Wear and Tear

Having found the hull rebuild required by the contract, I now must determine the appropriate deduction from the Exercise Price for this item. McMillen indicates that the required hull rebuild, not using (presumably more expensive) historic hull components, would cost $2,750,100.[59] In evaluating this figure, I find instructive McCann's testimony. Silversmith's expert admitted that if a hull rebuild is done, McMillen's estimate is "fair and reasonable."[60] I also find instructive an email

---

[56] May 11, 2016 Default Option Hearing Tr. 56:21–58:1 (McMillen) (emphasis added).
[57] *See* JX 51 at 56–64 (compiling photos).
[58] *See* JX 7 (stating the "vessel is in excellent condition without qualifications as to the age of the vessel"); JX27 ¶ 2(d) (admitting that the loan was "fraudulently induced" through "fraudulent misrepresentation").
[59] JX 51 at 15.
[60] May 11, 2016 Default Option Hearing Tr. 301:12–22 (McCann).

17

Silversmith sent in 2014 where he stated "the estimated replacement cost of the hull is $2.5 MM."[61] I find a deduction of $2,750,100 to put the hull in the Contractual Condition appropriate.

Silversmith was required to maintain the Sequoia in the Contractual Condition, "*ordinary wear and tear excepted.*"[62] Silversmith argues that rotted structural members requiring a hull rebuild are the type of "ordinary wear and tear" which the contract meant to exclude. His argument is contrary to the record and to common sense. Silversmith's expert, McCann, had no opinion on what aspects of the Sequoia's degradation, if any, would be considered "ordinary wear and tear" even though he agreed that it is a term of art in the industry.[63] McMillen testified that "wear and tear" is a term of art—it refers in these circumstances to conditions that develop between the times regular maintenance is performed—paint work and bright work that need periodic renewal, for instance.[64] In other words, Silversmith would not be in breach of contract because a paint job done yearly was in need of renewal in month eleven. The purpose of the Contractual Condition provision was to require Silversmith to maintain the condition, and thus the value, of the Sequoia as collateral for FE Partners' loan. Excepting, as wear and tear, the complete loss of

---

[61] JX 31.

[62] JX 12 § 2.9 (emphasis added). I note that the Loan Agreement modifies its wear and tear provision with the word "reasonable," rather than the word "ordinary" used in the Mortgage Agreement. *See* JX 13 § 5.7.

[63] May 11, 2016 Default Option Hearing Tr. 272:4–13 (McCann).

[64] *See id.* at 73:14–74:23 (McMillen).

structural integrity of the Sequoia's hull is irreconcilable with this purpose. McMillen testified, and I am persuaded, that wear and tear could include some woodwork for "damage done docking" but "a hull that is tremendously degraded in structure is well beyond normal wear and tear."[65] I find the plain meaning of this wear and tear exception requires that repairs necessitated on account of ordinary use are "excepted," however, structural damage or damage caused by neglect or negligence are not.[66]

Although he offers no evidence that "ordinary wear and tear" refers to the Sequoia's current degraded state, Silversmith cites *Weeks Marine, Inc. v. Picone, Inc.*,[67] for the proposition that "wear and tear" is an ambiguous term that in context can mean structural degradation.[68] That case is unhelpful. *Weeks* involved a ship

---

[65] *Id.* at 151:13–52:5 (McMillen). McMillen opined that other ship systems on the Sequoia require expenditures to bring her to the Contractual Condition. Because the deduction of the hull repairs alone brings the Exercise Price to zero dollars, I have not considered those repairs or whether they would fall within the "wear and tear" exception.

[66] *See* Wear and Tear, Black's Law Dictionary (10th ed. 2014) ("Deterioration caused by ordinary use; the depreciation of property resulting from its reasonable use"); *see also Moran Towing Corp. v. M. A. Gammino Const. Co.*, 363 F.2d 108, 114 (1st Cir. 1966) (noting that "[t]he effects of negligence are not wear and tear, and they do not become wear and tear merely because they may be anticipated"); *Otto Candies, Inc. v. McDermott Int'l, Inc.*, 600 F. Supp. 1334, 1343 (E.D. La. 1985) (noting that "[s]tructural damage, on the other hand, is not considered wear and tear and must be repaired in order for a vessel to be certified for ocean-going service").

[67] 1998 WL 717615 (S.D.N.Y. Oct. 14, 1998).

[68] *See* Pls' Post-Hearing Opening Br. 43–45; Pls' Ans. Br. 20. I note that even if I were to consider this term ambigious, and turn to extrinsic evidence I would find the most compelling evidence of the parties' intent is informed by representations that the Sequoia was in excellent condition. *See* JX 7 at 7 (stating the "vessel is in excellent condition without qualifications as to the age of the vessel); JX 27 ¶ 2(d) (admitting that the loan was "fraudulently induced" through "fraudulent misrepresentation").

19

lease for a barge meant to carry heavy bulk loads, and the contract required her to be returned in the same condition delivered, "wear and tear" excepted.[69] The *Weeks* court, unremarkably, looked to what degradation of the vessel would be expected given her intended use during the lease period.[70] Here, by contrast, Silversmith was obligated to keep the Sequoia in good repair to maintain its value as loan collateral, and the excepted wear and tear, as expressed above, referred to minor degradation, not failure of structural integrity. *Weeks* does not support Silversmiths' argument that the cost of bringing the yacht into "good working order and repair" with regard to a hull rebuild must be reduced as excepted wear and tear. The cost of that required repair I find to be $2,750,100. Once that amount is deducted from the Exercise Price, that price is reduced to the agreed minimum, zero dollars.

*B. Additional Deductions*

FE Partners seeks dozens of other deductions pursuant to the Judgment Order and the Loan Documents, which I decline to address here because the Exercise Price is zero. In light of FE Partners' statement that it would treat a zero dollar Exercise Price as a minimum, and in light of the fact that it has irrevocably exercised the

---

[69] *Weeks*, 1998 WL 717615, at *1–2.
[70] *See id.* at *6–8. I note that the *Weeks* court gave weight to the fact that the item for which the plaintiff sought replacement, the deck plating, was already worn thin at the start of the lease. *Id.* Further, in *Weeks*, there were competing experts who testified to what reasonable wear and tear was in light of the barge's use. *Id.* at *3–6. Under those circumstance the *Weeks* court was persuaded that requiring the proposed repairs on items that were already worn at the start of the lease would result in an "inequitable" "windfall." *Id.* at *8. That is clearly not the case here.

option, I make no finding as to whether the Judgment Order would have allowed FE Partners to both pursue recovery of contractual damages *and* to exercise a zero dollar Exercise Price, nor do I determine whether any of its additional proposed offsets have merit.

### III. CONCLUSION

The adjusted Exercise Price is zero dollars. The parties should provide a form of order consistent with this Letter Opinion, and inform me of any reason that this matter should not be closed.